Afternoon everybody, the next case on our docket is Watson v. Mead Johnson et al., 5-24-0936. Appellant, if you are ready to proceed, you may do so, and please introduce yourself for the record. I will, Your Honor. Good afternoon, Your Honors. May it please the Court, Paul Schmitt for the Mead Johnson appellants. We appreciate the Court's time in terms of our opening argument and the rebuttal, and subject to any questions that the Court has, I intend to focus on two overarching issues in the course of my argument. The first is the legal error in not applying the learned intermediary doctrine, given that this is the most medically regulated setting that exists and there's no dispute. This product could not have been provided here without a prescription. And the second is the evidence issues and the jury instruction issues. The jury instruction steered the verdict on critical issues in the case. The evidence issues compounded that, and they took a verdict that was supposed to be a compensatory verdict and made it into a punitive verdict in a case that had no punitive damages. Aren't the jury instructions related to the learned intermediary doctrine? No, they're separate because they were how the jury would be charged in the event there was no learned intermediary doctrine. And there was still a fact question in that instance over who was the relevant consumer, who was the relevant user. And the judge instructed the jury on who the relevant user was. That was a highly contested issue where plaintiffs themselves put in evidence that the relevant consumer was the hospital. They put in hospital contracts. They introduced the fact that Ms. Watson never handled the formula, never chose the formula, never bought the formula. So it instructed the jury on what should have been a contested issue once the learned intermediary doctrine was denied as a matter of law. Both those issues matter immensely in terms of we've seen the outcry to this verdict from the medical community in terms of the American Academy of Pediatrics statement we cite from public health communities. I won't touch on that further. We briefed that issue other than to note that we now have an amicus brief from the American Academy of Pediatrics agreeing on those points in this very case. Starting off with the learned intermediary issue, we have no appellate law here in Illinois or frankly anywhere else in the country, one way or the other, saying whether preterm formula is covered by the learned intermediary doctrine. That's a decision this Court has to make in the first instance. And I would suggest two ways of thinking about that decision and how it should be made in this case. One way is to look at the basic rationale for the learned intermediary doctrine that the Supreme Court announced in the Kirk decision. In that decision, the Court talked about the role of the physician. Is the role of the physician to make an informed decision? Is the physician acting as a medical expert? Is the physician exercising, quote, medical judgment bottomed on a knowledge of both patient and palliative? All of that applies here given the unique NICU setting in which preterm formula is administered and was administered here. The NICU setting is one of the most medically regulated settings that exists. It's the setting where there is literally 24-hour life-saving care to try to preserve the life of a human being who isn't yet meant to be in the world, isn't yet physically ready to be in the world, where every decision and feeding is at the forefront of those decisions, is subject to medical decision-making, medical risk assessment, medical balancing of individual patients. It's a little astonishing to think that the learned intermediary doctrine would apply without question if one of us goes to our doctor and says, I've got a little bit of a head cold, and the doctor talks to us for 30 seconds and says, here's a prescription for an antibiotic. But it doesn't apply when doctors are working on one of the most essential aspects of trying to save a preterm infant's life, ensuring that they get the right kind of nutrition. And the facts of this case highlight that point in terms of what we know about the hospital, what we know about the doctors, what we know about the plaintiffs. Pointing out that Infomil can be ordered online. Infomil was at the time available only online and only as intended for someone who started in the hospital and continued using it after they left the hospital. But that doesn't change the fact here that it was not available here without a prescription. And that's uncontested. She could not have given, she couldn't have bought it online and given it to her son in the NICU. She didn't even have control over his feeding in the NICU. It's so medically regulated, he had a feeding tube where she wasn't feeding him. So she could have gotten it online but only after she was initially prescribed. Yes, yes. And she could not, I mean, I guess she could have ordered it online before, but she couldn't have given it to him in the hospital setting. She could only give it to him once he left. And there's really no dispute in the record about that proposition. Nor is there any dispute in the record about the level of medical involvement in this decision. The hospital had a protocol that said he would get donor milk for a certain period of time and then whether he stayed at St. Louis Children's Hospital or came across the river to Memorial, he was going to switch to Formula because of limits in the availability of donor milk. That speaks to the level of decision making. The hospital actually wrote out written warnings for patients on this issue. We recommend the use of donor milk as an alternative to mother's own milk because of the increased risk for problems like neck with the use of formula. She didn't think she got that written warning, but the fact that the hospital both came up with a protocol based on the very science that the plaintiffs relied upon, and I should note, this isn't a case where they're saying Meet Johnson did studies no one knew about. Their case was proven based on public studies of the very type that the hospital relied upon in coming up with this protocol and giving these warnings that her doctors said we know about. They were able to cite studies. They were able to cite data from studies. That all speaks to the level of medical decision making involved in this question. That all supports application of alerted intermediary doctrine. The individual doctors in this case reinforced this point. Every doctor said he could not have received preterm formula without a doctor allowing it. Their causation expert, Dr. Sims, admitted that truth. He admitted we're talking about a feeding option that these babies receive only with the order of a doctor. He said we're not talking about a product to your Honor's question that someone walks into the grocery store and picks up off a shelf. There's medical judgment to be applied based on the individual circumstances of any particular baby. All those facts were undisputed. It's notable in that regard that the jury heard from doctor after doctor, neonatologist after neonatologist. Not one of them questioned either that doctors had to make the judgment here or that doctors made the right judgment here in terms of giving the formula. Even plaintiff's counsel recognized some of these points in briefing below. It is uncontested that a treater's authorization was required before Chance Dean could first receive formula. There's no dispute about that. And the first prescriber in this case, Dr. Najaf, said even after she was deposed, even after she heard the plaintiff's allegations, that she provided enough information about the potential risk of neck for Ms. Watson to make an informed decision. So the doctors recognized, too, not just they had to prescribe, but they had to obtain informed consent as part of that process. And they testified, and the plaintiff's lawyers contested this, they testified that they did provide sufficient informed consent, even after going through the litigation process, even after hearing whatever evidence counsel opposite were able to put in front of them. The final point on this is Ms. Watson herself reinforced this point. She said she relied on her doctors, and the language she used is critical. She said, I relied on them from an education standpoint. When someone is relying on a doctor from an education standpoint, that's heartland learned intermediary. And she proved that. She actually received from the federal government as part of a WIC program a warning that told her about the risk of neck that she produced in the case. It said, human milk protects premature infants from life-threatening gastrointestinal disease relative to formula. She said, I don't know if I read that. I don't know when I got it. We said to her, well, what if you had read it? What would you think? And she says, I don't understand it. So it wouldn't set off any alarm bells for me. That gives lie to the suggestion that doctors aren't essential in this process. And her testimony that she relied on her doctors from an education standpoint gives lie to that point. All those points are reinforced by the fact that the relevant medical associations here, both at a national and at a state level, put in an amicus brief underscoring the importance of formula, the relevance of medical decision-making, and medical knowledge about neck. That's one way to think about the question. The other way would be a much more technical, and it goes back to your first question, way to think about the question. Is this a prescription product? It's recognized as a prescription product by federal regulation, typically prescribed by a physician. That's the word of the federal regulation. Generally not available at retail. That's how this product is treated. It's recognized as such by state regulation, the motion to supplement that court recently granted. Formula changes shall not be instituted except by written order of the attending physician. And every doctor in this case talked about prescribing formula. Even plaintiff's medical experts, Dr. Sims, admitted he would leave the courtroom, go back to Alabama where he came from, and continue prescribing preterm formula where it was appropriate. Even their marketing expert agreed every time Chance had EPF 24, it was prescribed by a physician. None of that was, and I'm sorry, I'm trying to track my time. None of that was an accident of language. It reflects the medical decision-making required and shot through this process from hospital level, giving written guidelines, looking at the science, to the individual doctor level, to what Ms. Watson herself told us. The final point I'll address on the learned intermediary doctrine is their general verdict argument, their attempt to avoid the merits of this issue that will affect every one of thousands of plaintiffs proceeding in formula cases against me, Johnson, and the other company that makes formula, Abbott, in Illinois state courts. The general verdict doctrine just has no applicability here. It applies in the words of the Martin decision that the plaintiffs invoke when there is the absence of any indication in the record as to which theory of liability the jury rested its decision on. Here we know. We know for two reasons. One, we know because the jury had three claims before it. One was the defective design claim. They rejected that, and that claim had specific allegations that were in the jury instruction supporting it about unreasonable risk, marketing with unreasonable risk, et cetera. And they had a failure to warn claim and a negligence claim. The plaintiffs said, well, maybe there was something in that negligence claim that was different than the claim they rejected, the defective design claim, or the claim they accepted, the failure to warn claim. And you can read through the four allegations in the negligence claim. They track directly to either what was in the design defect claim that the jury rejected or the failure to warn claim that the jury accepted. And if there were any ambiguity on that point, counsel made it clear in closing argument multiple times that negligence was only failure to warn. That's what he told the jury. Closing argument is to explain your theory of the case to the jury. They explained their theory of the case on negligence was failure to warn. Negligence, that's a word we all use in our daily lives, but you'll see in the instructions, and I'll go over some of them with you that you'll hear from the judge later. It's basically did Meade Johnson act like a reasonably careful company should have acted in putting this on the marketplace for these preterm infants and doing so without any warning whatsoever to parents like Jasmine Watson? They said it again. Talked about negligence. Count three is negligence. They talked about what a reasonably careful manufacturer would do, and then they explained what they were criticizing. Is that really putting out this product without a warning something that a reasonably careful manufacturer would do? It is not. They made clear their negligence claim was a failure to warn claim. They even reinforced that point in their briefing here. Page four of her brief, Plaintiff says, well, my negligence claim was being positioned as an alternative to the defendant suggesting that a finding on the design defect claim would result in the product being pulled from the market. And they cite closing argument language that they offered for that proposition. But even that language reinforces this point. If Meade Johnson scares you into thinking on count one, that's the design defect claim, somehow there's not going to be formula out there. And they continued on. They said, well, they should at least be warning people. Come on. That's at R5170, lines 7 through 12. We know the jury rejected the dangerous designs allegations. We know from the negligence charge that all that left was failure to warn. We know from closing argument that that's what the jury was told negligence meant. There's no general verdict issue here. That brings me to the evidence and the jury instructions, and I'll be quick on these to Your Honor's opening question. Once the judge said no learned intermediary, there was still a question as to who the relevant user or consumer was. In the clear language of IPI 400.07D, the plaintiffs had actually proposed the jury be charged with just those words, the user or the consumer. They had put on evidence that supported the user or consumer being doctors, the hospital. But then after the close of evidence, they switched course and they said, no, we should define it as Ms. Watson and people like Ms. Watson. That took a highly contested issue in the case and told the jury how to resolve it. And that violated three black letter rules of Illinois jury instruction law that plaintiffs don't even address in their brief. It violated Supreme Court Rule 239A that the IPI shall be used unless it's legally wrong. It wasn't legally wrong here. They don't even cite 239A in a case where they're very quick to argue waiver. That is a clear waiver by itself that alone requires reversal. The second principle is the charge violated the core legal requirement that charges not be argumentative. This was argumentative. It wasn't just argumentative. It told the jury that a contested factual issue was actually resolved in the plaintiff's favor. And if there was any doubt about that, they peppered their closing argument with that very point to the jury. All these things you've heard from Meade-Johnson are wrong because the law tells you all that matters is Ms. Watson. You have a duty to make sure that she knows that's what the law says. I guess Meade-Johnson's position is it was really the doctor's fault. Well, that's not the law. You saw what the instruction was. They owed the duty to Jasmine again and again, taking an argumentative instruction and proving that it was argumentative. That's a clear violation of Illinois jury instruction standards. No response to that in their brief. Again, waived. And then third, Illinois law recognizes, cases like the Marine case recognize, that a party is entitled to have the jury instructed on its theory of the case. And this did not do that. This did the exact opposite of that. This case actually illustrates why that principle exists. There was a dispute throughout trial over who the relevant consumer was, the fact that what did it mean that the hospital purchased the formula? What did it mean that she never handled the formula or said she never even knew about it or saw it until a week into her son was using it? What is the relevance of doctor knowledge? All of those points were points not just we put in evidence on, but they peppered their case with an expert talk about doctor knowledge. They put in the contract with the hospital. All of those were relevant to our theory of the case and to a theory they prosecuted for much of the case, and then the court took that theory away. It denied a charge that's consistent with how the case was tried. Those are three independently sufficient black-letter reasons to reverse based on the jury verdict, and they compound with the evidence issues. This is a case where the plaintiffs asked for $25 million from the jury. The jury came back with what was clearly a punitive award, $60 million. And they did so because even though there wasn't a punitive claim in this case, the plaintiff was allowed to try a punitive case to the jury with evidence that had no relevance to the facts of this case. The simple weight of the evidence illustrates that point vividly. Nineteen witnesses and plaintiff's case in chief, only six of them talked about the facts of her case. The rest talked about marketing she never saw, her doctors never saw. There were more marketing witnesses than witnesses to talk about the facts of her case. Fortifier that she didn't use that she actually said. Fortifier didn't cause neck. It's irrelevant. Yet, that peppered her case. Wouldn't the marketing information be relevant as to the cost of actually issuing a warning? I remember my first year torts instructor said, warnings are cheap. Yeah. I don't think there was ever a dispute on that point that it was somehow cost prohibitive. There was a dispute that it was not a realistic way to warn patients that she herself reinforced by saying, when I see something that warns me about life-threatening gastrointestinal disease, I don't know what that means. But there was no dispute about cost. That wasn't a contested issue. It's almost a feasibility question, going back to black-letter tort principles. If feasibility is contested, then sometimes that information can be relevant. Here, it wasn't. What was contested was, would it be useful? Would it invade the doctor-patient relationship? Would it add meaningful information to what the doctors already knew and what they said they warned her about in obtaining informed consent? And cost has nothing to do with that. That has to do with just the medical nature of this product. And that's true for the other evidence arguments. They just weren't on issues that were contested here, and to the extent they were contested, it was plaintiffs introducing an issue and then saying, Aha, you're fighting us on this, now we get to introduce more of it, which is not a legal standard. That contrasted with limits in our evidence where we weren't allowed to show why. She spent a lot of time talking about this very grisly off of her surgery. We weren't allowed to address that. We weren't allowed to address how she responded to other warnings when that was the heart of her approximate cause case. A little bit more of a warning would have changed everything. Thank you, Your Honors. I'll reserve the rest. My question involved that general verdict issue, and I think he addressed it. Thank you, Your Honor. All right, thank you. Thank you, Your Honors. May it please the Court. Sean Grimsley on behalf of Plaintiff Eppley. There were no errors in the trial below, certainly no errors that would justify a reversal or remand for a new trial. Of a trial that took three weeks, the jury came back unanimously in less than 90 minutes on behalf of plaintiff in this case. Now, I'll start with the learned intermediary doctrine because that's where my learned contemporaries are. How does the rationale for learned intermediary doctrine not apply to the preterm formula? Your Honor, every court that has actually looked at where and when to apply the learned intermediary doctrine has limited it to prescription drugs and medical devices. The rationale is the same, is it not? Well, the rationale is not the same, Your Honor. First of all, prescription drugs are heavily regulated by the FDA. There are a lot of requirements that go along with prescription drugs that did not apply to infant formula. For instance, if this were a prescription drug, there is no debate that there would have been an insert inside of this formula that contained the very warnings we say should have been on this label. Because it is a food and not a drug, those warnings are not there. And every court to consider it again has applied it only to prescription drugs and medical devices. But it's a food that can only be prescribed by a physician. And I'll push back on that. They keep saying that it's a prescription food, it's a prescription food, it's not a prescription food. Every witness at trial asked whether this was a prescription food, said no, it is not. I asked their executive, Robert Cleveland, could anybody in this room go right now and order this online and have it in their house next week? And he said yes. The other witnesses said yes, this is not a prescription drug. It does not carry with it all of the hallmarks of a prescription drug. Okay, so let's say it's not a food. It still had to be prescribed by a physician, did it not? It didn't have to be prescribed. And I'm pushing back on that language because I think we're using that colloquially and the cases use it in a very specific way because it's a prescription. Just like many things in the NICU and in the hospital setting, they have to be administered by or given by or approved by a doctor. A special diet given to a patient in the hospital, footwear in the hospital, blankets, almost everything in the hospital is going to be something that is in some way prescribed, if we use that term loosely, by a doctor. But nobody would suggest that the learned intermediary doctrine is going to apply to all of those very different things. And that's why courts across the country have not applied the learned intermediary doctrine to foods like this. And something else that courts across the country have not done, and certainly not in Illinois, is adopted a location-based test for determining whether the learned intermediary doctrine should apply. Was it given in a hospital as opposed to was it something you bought online? Every time a court has been confronted with a situation where a product could be purchased outside of the hospital, but also given inside the hospital, has said the learned intermediary doctrine doesn't apply. And it makes sense. It makes sense. So first of all, there are places where bright-line rules are really useful. Sometimes context-dependent determinations make sense. Sometimes bright-line rules make sense. This is one of those places. Manufacturers need to understand what the tort regime is going to be that they are going to be subjected to and what their exposure to liability is when they put out a product. And if it's given at retail and also available at the hospital, they need to know that they need to put that warning on there in order for the end consumer to get that warning. Just keep in mind, a learned intermediary doctrine is itself a narrow exception to the general rule that the manufacturer owes it duty to the end consumer to warn of the dangers of the product. So a bright-line rule is good for the manufacturer. A bright-line rule is good for the doctor. Because the hallmark of a learned intermediary doctrine is there in that very limited circumstance, the manufacturer can comply with its duty by just warning the doctor, but then as the cases make clear, including Kirk, the duty then shifts to the doctor. And the duty then is on the doctor to warn the patient. The doctors need to know what type of products are out there that they have a duty, and the tort liability then shifts to them. A bright-line rule is important for consumers, who shouldn't be subject to different tort regimes and have different rights depending on whether they first got the product in the hospital or first used it outside of the hospital because they ordered it online. They should know what their rights are. And God forbid there's a situation in which the person gets it both in the hospital and afterwards at retail, and you have no sense of what the duties would be in that circumstance. Wasn't the plaintiff here completely, 100% dependent on the advice given her by her physician? No, they were not. She was not 100% dependent, and the record was clear on this. She was asked these very questions, Your Honor, and the jury was entitled to credit what she said. She said, yes, of course, the doctors from an education standpoint know more than I do, but I am his parent. I get to decide what he wants or will get to eat. And she was the one who made the ultimate decision. And every single person asked the question at that trial agreed that the ultimate decision, as opposed to a prescription drug, the ultimate decision is up to the parents to decide what their children get fed, even in the NICU. She could have insisted, and she said, I would have insisted, that the child get Derma. The doctor could not, as they would in a prescription drug context, say no. That would have been wholly up to the parent, in this case, Jasmine Watson. And the line-telling issues get very difficult if you start thinking about location-dependent tests as opposed to just product-based tests. So look at the Simmons case out of Waukegan. That was a case, another infant formula case. An infant was fed Neosur, which is an Abbott product, in the NICU, developed NAC, just like the plaintiff in this case. And Abbott came in and said, you should apply the learned intermediary doctrine for all the reasons that Mee Johnson is arguing here. And the court there said, no, first of all, it's not a prescription drug. It's not a medical device. And actually, the rationale of Kirk does not apply. This is not a drug so esoteric or complicated that you need the doctor's intervention for a parent to understand what the risks and benefits of the drug are. Now, they come back in their reply, and they try and distinguish that Simmons case. They say, well, Neosur, unlike EPF24, is available more often at retail than it is in the NICU. Okay, so the test is going to be how much more often is the product available at retail versus how often is it given in the NICU. That cannot be the test that this court is going to adopt. That's why bright-line rules in a place or a situation like this matter, and that's why the court are so uniform across the country that, and we didn't cite this, but you can look at it, the Restate and Third Towards Products Liability, Section 6, explicitly applies the learned intermediary doctrine just to prescription drugs and medical devices because if you start going beyond that and start applying other tests, people just don't know what the rules are going to be ex ante. But the court does not need to get to what is a thorny issue. The court does not need to be the first in the country to consider whether a food is subject to the learned intermediary doctrine or whether to be the first court in the country to apply a location-based test rather than a product-based test to determining whether the learned intermediary doctrine applies because there's the general verdict rule. There are two reasons the general verdict rule requires this court not even to get to the learned intermediary doctrine. The first is that in their opening brief, the negligence verdict was mentioned once in a footnote in the background section. There was no mention anywhere in their opening brief of the general verdict rule, and this is not an argument that we made for the first time in our opposition brief before this court. This was an argument that was our first argument in the post-trial motions, our opposition to theirs in the trial court. They responded to it in their reply in the trial court. The general verdict rule featured prominently in the hearing on post-trial motions in the trial court, and the trial court denied the post-trial motions on the basis of the entirety of the legal arguments made. There is no excuse for not having brought up and challenged the application of the general verdict rule in their opening brief. That is classic waiver. I think it was sandbagging to see what we had to say about it, so they wait for their reply brief. But even if you put aside the waiver issue, the general verdict rule says if there is any basis upon which to base the verdict and you're not challenging that basis, then the general verdict rule applies and you can ignore. It basically renders moot the arguments that don't go to those other bases. And everybody agrees that the limited intermediary and related jury instruction issues were related solely to failure to warn. We have four negligence theories, as we point out in our brief, only one of which, the fourth, had anything to do with failure to warn. The first three did not have to do with failure to warn. That alone right there means we went under the general verdict rule. Now, Mee Johnson comes back and says, well, those three negligence theories were just coextensive with the design defect claim that we lost on below. That is not the case. They point out what I said in closing argument, and we point to the cases that say what I say in closing argument doesn't narrow the scope of the claims. One can decide what things they want to push and what things they don't want to push in closing argument, but that does not change the jury instructions. That does not change the breadth of anybody's claims. But all you have to do is look at the three negligence theories to see that they are not coextensive with the design defect claim. The third negligence theory is negligent marketing. That is not coextensive with a design defect claim. Negligent marketing. And we put on evidence not just that their marketing failed to warn, but they were out there actually affirmatively misleading the public as to the safety of the product. They had the I am a preemie pamphlet that was in the NICU that said your baby, regardless of whether they get breast milk or preterm formula, is going to be happy and healthy. This is misleading. They were out there educating doctors, downplaying studies that showed the preterm infant formula was far riskier when it came to neck than donor bone. So it wasn't just a failure to warn. They were actively out there misleading the public. That claim right there is not coextensive with the design defect. But there is something more fundamental about the case. In closing argument, they argued that this can't be defectively designed. It can't be unreasonably dangerous because there are uses for this product. And there was evidence in the record in the case that said for babies who are over 1,500 grams, even preterm babies, maybe preterm formula is okay based on the science. Or certainly if there's a hospital where donor milk is not an available alternative, you have to use preterm formula. And they said doctors all said we still use it in appropriate circumstances. Well, those would be appropriate circumstances. So the jury very easily could have found against us on the design defect claim. But found for us on the negligence claim because Meat Johnson is still out there marketing that product for babies like Chance Dean who are the most vulnerable, less than 1,500 grams, where donor milk is available. Again, not coextensive. And you don't have to listen to me. Just listen to Meat Johnson. If you look at the issue instructions for both design defect and for negligence, their defenses are different. Didn't some of your experts say they still would give preterm formula? Where appropriate. And that's the point. If you are in a hospital like, for instance, in this case Memorial Shiloh where Chance was transferred to when he didn't have to be, if they don't have donor milk, you've got to give preterm formula. There may be an objection that a parent has. They don't want to get a biological substance from another human being. You have to have preterm formula there. So where appropriate, there are uses for it, at least based on the evidence in the record. Maybe larger babies. But where it is not appropriate, and the jury certainly could have found that Meat Johnson was negligent, is selling and marketing to babies like Chance who are under 1,500 grams and had donor milk available. But let's say you believe that those first three negligence theories are coextensive somehow with our design defect claim. There's a fourth negligence theory. And that fourth negligence theory was the failure to warn theory. And it asked the jury to find that Meat Johnson was negligent for failing to adequately warn parents and health care professionals. In order to find for us on negligence theory four, which they say is the only one that we want, but the general verdict would say it anyway. It says you have to find that Meat Johnson failed adequately to warn parents and doctors, health care professionals. In the closing argument, the plaintiffs say they don't have to warn the hospital or the doctors. They have to warn Jasmine Watson. With regard to the strict liability failure to warn duty, we repeated what the instruction was in 400.07D as modified to clarify that the hospital and doctors weren't the consumer because that would just be a backdooring of the learned intermediary doctrine. But nothing with respect to the negligence claim. Nothing with respect to the negligence claim where there's a very different duty. It's just the duty to exercise ordinary care. That's what the instruction said. There's a separate duty instruction. And that negligence theory explicitly says you have to find that Meat Johnson failed adequately to warn parents and health care professionals. So even if the learned intermediary doctrine had been applied, the jury found that health care professionals were not adequately warned. It would also be harmless error if the learned intermediary doctrine had been applied, not only because of that finding on the negligence theory four, but there's no dispute that Meat Johnson never warned doctors. Keep in mind, the learned intermediary doctrine says you don't have to warn the inpatient, you have to warn the doctor. And then it's the doctor's duty to warn the inpatient. There's no dispute that Meat Johnson didn't warn the doctors in this case. They relied on the doctors finding out the information from some other place. And they say, well, the doctors already knew, so we didn't have to warn them. But didn't your own experts say all neonatologists know that NEC, there's an increased risk of NEC with cow's milk forming? No. Our expert did not say that, but here's what the evidence was. Many of the doctors understood that there was some risk differential, but what they didn't understand was how significant the magnitude of the risk differential was. So the treating doctors, the ones who really mattered in this case, the ones at St. Louis Children's Hospital, Drs. Najaf and Drs. Lajowska, they said that any increase in risk was slight. Slight. And Dr. Najaf said if she actually talked to her patients, that's what she would have told them. Their own expert, Dr. Susan Hayes, said two X or more, which is what the evidence showed and which they seem to agree is the case now, that's not slight. Our expert said that's not slight. Their medical director from North America, Deb Valentine, said that's not slight. Even their sales rep, Jessica Mackey, confronted with this, said, oh, yeah, that's not slight. Now, they come back and say, well, there's this case called Hansen v. Baxter, intermediate appellate court decision from the first district, that says, well, you can satisfy your duty to warn even if you don't give a warning when the learned intermediary doctrine applies by just pointing out that the doctors generally understand there's a risk difference. That's just wrong, and that's the only case they cite for it. We cite other cases, including the Supreme Court's decision in that very case, Hansen v. Baxter. The Supreme Court was asked, is that reasoning in the intermediate appellate court's decision in Hansen v. Baxter right? And the Supreme Court said no. If there is a substantial difference in the understanding of the doctors about the magnitude of the risk, and the manufacturer, the manufacturer needs to warn. And that was the evidence in this case. And there are other cases that say the same thing. Proctor v. Davis says the same thing. Mohammed v. Abbott Laboratories says the same thing. In fact, Proctor v. Davis goes so far as to say manufacturers can't shirk their duty to warn doctors when there's an unequal knowledge about what the risks are by hoping that they might find it out from a third party. That's what Mee Johnson's doing here. Mee Johnson easily could have put a warning on that label. Would have gotten the doctors, would have gotten to the end patient. The evidence was clear. You know, they talk about how a warning would not have actually gotten to Jasmine Watson. She didn't read warnings. The evidence in this case from their own expert was if there were a warning on the label, even if she, the expert neonatologist, didn't read labels, she would have been apprised of it immediately and she would have told it to her patients when she advised about donor mode versus return formula. Our witness, Dr. Swanson, said the exact same thing. Their medical director said, yeah, it would be the obligation of the doctor to do so. And it only makes sense that if you put a warning on that label, hospitals that are concerned, obviously, about medical malpractice risk, would ensure that their doctors are conveying that risk and that warning to the patient. And in this case, the patient said, if I had been given that warning, I would have made a different decision. He wouldn't have made a different decision. The question was whether we move the child a few miles closer to your house, but, oh, by the way, if we do that, the child's going to be subject to a substantially increased risk of neck or you have to drive a few more miles every day and they can stay on donor mode. She sensibly said, yeah, I would have absolutely insisted that she stay or my children stay in St. Louis and get donor mode. As far as the jury instruction issue goes, Your Honor, you're right on, you know, what the judge said was you're just trying to backdoor the learned intermediary doctrine through the jury instruction. At the charge conference, he ruled learned intermediary did not apply. They then said, well, what we're going to do is argue that the doctor and the hospital aren't the ones to whom the duty is actually owed under this instruction. The judge says we did just backdooring in the learned intermediary doctrine. It would have been error if the judge had allowed them to make that argument, given his ruling on the learned intermediary doctrine. You don't have two different parties go to a jury arguing two different views of the law. This was not a contested fact issue. This was a legal issue as to who the duty was owed to. And the judge had made that ruling, and they threatened that they were going to undermine that ruling by what they did with the jury. And their cases that they cite for the proposition that they have the right to have a jury instructed on their theory of the case doesn't go that far. You don't have the right to have the jury instructed on a theory of the case that is contrary to the law. And finally, on the evidentiary issues, Your Honor, they seem to forget how deferential the standard is when it comes to evidence. And I want to say, just this Court's ruling not too long ago in Campbell v. Altenreib said, evidentiary rulings are within the sound discretion of the trial court. This is the most deferential standard of review recognized by the law. Rather, a trial court abuses its discretion only if it acts arbitrarily without the employment of conscientious judgment, exceeds the bounds of reason, and disregards recognized principles of law, or if no reasonable person would take the position adopted by the trial court. And the reason for that is obvious. The trial judge has the opportunity to see everything, the arguments, motions eliminated, summary judgment, opening statements, evidence as it's coming in, and make rulings based on the context of the case. And that's precisely what Judge Foley did here. He wasn't just shooting at it. How is the fact that a CEO made $24 million relevant to any issue in this case? It's absolutely relevant, Your Honor. That goes to bias. You are always allowed to ask a witness who works for a company and they're testifying on behalf of the company what they're being paid. They didn't object to any of the other witnesses who were asked their salary, Robert Cleveland or others. They objected because Mr. Kapoor's salary just happened to be larger. But what that shows is greater bias, not less. How is marketing evidence relevant when the plaintiff never saw it? Because, and I'll point to two sites in the record, Your Honor, because much of the marketing evidence went to the hospital. And in the record, during the motion eliminate argument, their lawyer said during that argument that they will not dispute relevance of marketing received by the hospital. That's an R-33922-340-5. During the questioning of Pomerantz, counsel said, we don't have any objection to her talking about how we market or how she thinks we market. It was just about whether she testifies regarding motive. And there were a lot of things that the marketing evidence went to. It was relevant, obviously, to the negligence claims. And the reason I say it was relevant, and the reason they admitted it was relevant to folks at the hospital, is because as they kept pointing out at trial, there were lots of different people at the hospital who prepared these feeding guidelines, which are things that the doctors looked at with regard to what to feed the infant, preterm formula, donor milk, breast milk. And that marketing, there was no dispute, went to dietitians, went to lactation consultants, went to nurses, went to other doctors at the hospital. And so that is precisely why they didn't object to the fact or the relevance of documents that went to individuals at the hospital. It can't be now heard to complain when they ceded that before trial in the context of the motion to eliminate. Thank you, Your Honor. I do. I mean, first of all, I'd say I think they've done a great job today so far. They've done a great job. There's a lot going on in this case. But, Mike, we talk about, or you talk about the Simmons case, and that order you talk about, that was the circuit court's. Correct, Your Honor. It's not an appellate court. Which I understand. And then you cite a couple of Missouri cases that are fairly recent. Does anyone know, and I probably should look this up, I apologize, the status of those either in the Missouri courts or Illinois courts where those are? I know that the Gill case, which is one of the Missouri cases, the appeal was argued, I think, two weeks ago. So I think it's kind of in the same position that this case is in. In terms of the Simmons case, I'm not sure what the current situation there is. I assumed if someone did know, they would be quoting it. One way or the other, you would think, yes. I just thought I'd ask. Obviously, we'll keep an eye on that. Thank you. Thank you very much. Thank you, Your Honor. May I proceed, Your Honors? Yes. I'd love to pick up with the very first question Your Honor asked, how does the rationale not apply here and walk through some of the arguments we heard in response. The first argument was every court disagrees. As Your Honor highlighted, the only cases we have that actually disagree with this proposition are cases from these preterm formula lawsuits, and they're a smattering of trial cases, none of which has received appellate review. The Whitfield case is on appeal. It's far, I think, from argument. I don't know the status of the Simmons case. That's an avid case, but I don't think there's an appeal there. But we can follow up if the court would like to know on that. So that was the first argument, every court disagrees. No court has held that when a product is only available in this instance by medical prescription, it is not subject to the learned intermediary doctrine, which is what they're asking this court to hold. Number two, he said drugs are different. Well, there are prescription drug cases that have no warning at all. The learned intermediary doctrine still applies as a matter of black letter law. It doesn't depend on some special warning regimen for prescription drugs. It depends on the nature to have a medical understanding to use those products. The same medical understanding was required here according to their own experts. It depends on needing to weigh the risks and benefits in individual patients. And, of course, the learned intermediary doctrine also applies to medical devices that are different from prescription drugs. Your Honor asked the question, well, didn't it have to be prescribed here? And counsel said, well, I'm pushing back on that language. I'm pushing back on that language. Here's who didn't push back on that language. Every one of the doctors in this case. Here's who didn't push back on that language. His experts in this case who talked about prescribing preterm formula, not just in terms of some catchphrase using the term prescribed, although they did that, but also in terms of the reasons why it's prescribed. Because you need a doctor to make this judgment. It's not something you just pull off the shelf and give to someone. It's something you need to have medical judgment to counsel the patient and make a decision as to whether it's appropriate. And, in fact, there's a representation that his experts did not concede that doctors all know about this risk. They did, and that's at R3248 to 3249. The federal government pushes back. It calls this something that is typically prescribed. The Illinois State Court government pushes back. It says this has to be prescribed. It has to only be given in a hospital with a doctor's order. They say, well, we could have just put a warning on the label. She never saw the label. That kind of speaks to the falsity of their position that, oh, it would be easy to just warn people. She didn't see the label, and it's not because she was careless. It's because the nature of this product is a patient is in a hospital. A parent is in a hospital. They have a child in an intensive medical setting receiving tube feeding. They're not involved in any of that. They can't be involved in any of that because it's too medically sensitive. And we were able to show on the record the one time she did receive a warning from the federal government, she said, I don't understand that. I would need to rely on my doctors from an education standpoint. The final argument that we need right-line rules. This is somehow location-based. That's a clever framing of an issue that's not really location-based. The right-line rule is if you can only get a product through a doctor because of the recognition that it is intensely medically regulated, that it's complicated, that it requires medical judgment, that it requires doctors to give informed consent, that the federal government says this is like a prescription. The state government says it should be treated like a prescription. The doctors recognize it should be treated like a prescription. That's where it applies. That's the right-line rule, and it doesn't shift the duty to doctors. They already have a duty that they acted on here to provide informed consent. They've sued doctors in other cases, including Memorial Hospital, to try to defeat diversity, where they say informed consent wasn't given, as well as suing us. And it doesn't shift the burden to the plaintiff because the plaintiff, we already know from her, and this makes absolute sense given the circumstances, is relying on her doctors. In terms of the general verdict rule, it's pretty remarkable that the first argument led with is we waived this by not addressing it in our briefing. We're not required to anticipate arguments they raised that the trial court did not adopt. The trial court made no general verdict doctrine finding. They put a proposed order into the trial court. They could have had findings on that point. They didn't. The trial court generally denied our post-trial motion. There was nothing for us to address, certainly nothing for us to waive. And when they walk through the other claims, it's clear that they're all claims that are subsumed within the design defect, within the failure to warn. They said, well, our third claim was negligent marketing. That's identical to their design defect, unless what they're saying is you should have told us something that you didn't, in which case it's a failure to warn claim. Same with their negligent failure to warn claim. That is a failure to warn claim. And that does require answering the question. Who gets warning? Is it the doctor? In which case, the learned intermediary doctrine should have applied. Is it otherwise? I thank the court for its time. Any further questions? Thank you both for your excellent arguments. We will take this matter under advisement and issue a ruling in due course.